Kathleen A. Tartivita
156 Bayside Drive
P.O. Box 142
Atlantic Highlands, N.J.  07716 - 0142
Defendant, pro se (732) 872-2145

RECEIVED

OCT 1 2 2007

AT 8:30_____ _____M
WILLIAM T. WALSH
CLERK

US DISTRICT COURT
DISTRICT OF NEW JERSEY

GNAT BOOTY MUSIC et al.

Plaintiffs

vs.

DOCKET NO. 3:06-ev-0522(GEB)

JAY KAY JAY, INC. and
KATHLEEN A. TARTIVITA

Defendants

## CIVIL ACTION
## NOTICE OF MOTION
## FOR SUMMARY JUDGMENT AND TO STAY DISCOVERY

### RETURNABLE ON NOVEMBER 5, 2007

**PLEASE TAKE NOTICE** that the undersigned will move before the above named Court on Monday, November 5, 2007 at 9:00 AM in the forenoon or as soon thereafter as they may be heard for an Order seeking the following relief:

(1) For Summary Judgment in favor of the defendants
(2) To stay any and all discovery pending a hearing on this motion

**PLEASE TAKE FURTHER NOTICE** that the relief requested may be granted by the Court unless timely written objection is filed with the Clerk of the Court.

The plaintiff will rely upon the attached Certification and Letter Brief in support of this Motion.
Oral argument is requested.

Dated:   October 9, 2007

Kathleen A. Tartivita, pro se

1

Kathleen A. Tartivita
156 Bayside Drive
P.O. Box 142
Atlantic Highlands, NJ  07716 - 0142
Defendant, pro se (732) 872-2145

US DISTRICT COURT
DISTRICT OF NEW JERSEY

GNAT BOOTY MUSIC et al.

Plaintiffs

vs.                                           DOCKET NO. 3:06-ev-0522(GEB)

JAY KAY JAY, INC. and
KATHLEEN A. TARTIVITA

Defendants

**CIVIL ACTION**
**CERTIFICATION IN SUPPORT OF MOTION**
**FOR SUMMARY JUDGMENT AND**
**OTHER RELIEF**

I, Kathleen A. Tartivita, defendant, pro se, by way of Certification in support of the defendants' Motion for Summary Judgement and to Stay any and all discovery hereby say:

1. This is a suit for alleged copyright infringement by the corporate defendant Jay Kay Jay, Inc., operating as Pumps Plus, and Kathleen A. Tartivita.

2. Kathleen A. Tartivita is the president of the corporation and was brought into this case individually without good cause.

3. Since the corporate defendant at all times paid the licensing fees to play the copyrighted music allegedly played at the establishment the plaintiffs have no cause of action against the defendants.

4. Prior to opening the business in 1992, the defendants signed an agreement with ASCAP allowing them to play the musical compositions in the repertory of ASCAP. That agreement is attached hereto as **EXHIBIT A**.

5. Payment was made to ASCAP at the agreed upon rate until the defendants contracted with TRK (cable) for a commercial music service entitled DMX. TKR was licensed by ASCAP and paid all of the applicable fees to them. **EXHIBIT B** is a copy of the

1

contract between the defendants and TKR cable as well as copies of the information regarding the DMX service.

6. ASCAP was advised of the TKR contract and of the fact that the defendants no longer had to pay ASCAP directly since TKR was paying all of the licensing fees and the defendants were paying TRK on a monthly basis. ( There is no dispute that the defendants paid TRK for the music service).

7. The agreement between TRK ( later Cablevision) and ASCAP is attached hereto as **EXHIBIT C** and clearly shows that TRK/Cablevision was authorized to offer the music service to its customers.

8. **EXHIBIT D** is an excerpt downloaded from the ASCAP website showing that no direct ASCAP license is required for bars using a radio and or satellite service for their music. DMX was a music service transmitted by radio to the bar and offered a variety of music on over 30 channels. TRK/Cablevision paid the licensing fees to ASCAP for the use of the music.

9. ASCAP accepted the fact that the defendants were using the DMX music service ( licensed by them) and made no attempts to enforce the 1992 contract which had expired on its own terms.

10. Beginning in 2004, the defendants began receiving letters from ASCAP seeking payment of fees from 1994 to 2004. Legal action was threatened although ASCAP had remained silent for the last ten years. The fees were strongly disputed.

11. In an effort to avoid litigation the defendants offered to make direct payment to ASCAP beginning in 2004. (**EXHIBIT E**) At first ASCAP would not accept the terms, returned my check, and still wanted fees from 1994. However, on June 29, 2004 ASCAP relented and sent a new fee agreement and operating policy to the defendants. **EXHIBIT F** is a copy of the letter and licensee's operating policy.

12. Again, in an effort to avoid litigation, the defendants signed the agreement ( **EXHIBIT F** ) and paid the amount requested, $949.00. ASCAP accepted and cashed the check. (**EXHIBIT G**)

13. Since June of 2004 the defendants have paid the licensing fees directly to ASCAP and ASCAP has accepted and cashed all of the checks for 2004, 2005, 2006 and 2007.

14. The plaintiffs allege copyright infringement on two dates in 2005. Since the defendants had paid, and continue to pay, the ASCAP licensing fees to play any and all of the music in the ASCAP repertory, including the music of the plaintiffs, there has been no copyright infringement and the plaintiffs claims are without merit. I am asking that the lawsuit be dismissed.

15. In addition I am asking this Court to stay all discovery in this case including the supplying of confidential tax records of the defendants pending the resolution of this motion.

16. The tax information will be used to assess a punishment on the defendants should they loose this case, so the plaintiffs will suffer no harm in a short delay in receiving these documents. The defendants, on the other hand, have incurred considerable harm at the hands of these plaintiffs and have no faith that the confidential tax records will not be used by them in an inappropriate way. In addition, ASCAP is the real party in interest in this case and while ASCAP may be able to sue in the name of the plaintiffs for alleged copyright infringement, ASCAP cannot use the plaintiffs to extort ASCAP fees from the defendants.

17. This case is totally without merit and I have been trying to minimize the legal fees and expenses caused by this abusive suit. I would hope that the Court would grant the requested stay of discovery pending the resolution of this motion.

18. For all of the above and in consideration of the attached letter brief, I respectfully request that my motion be granted and the complaint dismissed with prejudice.

Certification: I, the undersigned, hereby certify that the above statements made by me are true. I am aware that if any of the above statements made by me is willfully false, I am subject to punishment.

October 10, 2007

Kathleen A. Tartivita, pro se

*no*
*005824-9*

# GENERAL LICENSE AGREEMENT—RESTAURANTS, TAVERNS, NIGHTCLUBS, AND SIMILAR ESTABLISHMENTS

**Agreement** between AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS ("SOCIETY"), located

at   Campus Center
Suite 215
120 Gibraltar Road
Horsham, Penna. 19044

and                                                                                          as follows:
("LICENSEE"), located at

*Jay Kay Jay, Inc.*
*PO Box 13*
*Keansburg, N.J. 07734*

## 1. Grant and Term of License

(a) SOCIETY grants and LICENSEE accepts for a term of one year, commencing *September 1, 1992* and continuing thereafter for additional terms of one year each unless terminated by either party as hereinafter provided, a license to perform publicly at

*Pumps Plus*
*77 Highway 36*
*Keansburg, N.J. 07734*

("the premises"), and not elsewhere, non-dramatic renditions of the separate musical compositions now or hereafter during the term hereof in the repertory of SOCIETY, and of which SOCIETY shall have the right to license such performing rights.

(b) This license authorizes performances by means of "jukebox(es)" as defined in the Rate Schedule attached to and made a part of this Agreement.

(c) This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns, but no assignment shall relieve the parties hereto of their respective obligations hereunder as to performances rendered, acts done and obligations incurred prior to the effective date of the assignment.

(d) Either party may, on or before thirty days prior to the end of the initial term or any renewal term, give notice of termination to the other. If such notice is given the Agreement shall terminate on the last day of such initial or renewal term.

## 2. Limitations on License

(a) This license is not assignable or transferable by operation of law or otherwise, except as provided in subparagraph "1(c)" hereof, and is limited to the LICENSEE and to the premises.

(b) This license does not authorize the broadcasting, telecasting or transmission by wire or otherwise, of renditions of musical compositions in SOCIETY's repertory to persons outside of the premises, other than by means of a music-on-hold telephone system operated by LICENSEE at the premises.

(c) This license is limited to non-dramatic performances, and does not authorize any dramatic performances. For purposes of this Agreement, a dramatic performance shall include, but not be limited to, the following:

(i) performance of a "dramatico-musical work" (as hereinafter defined) in its entirety;

(ii) performance of one or more musical compositions from a "dramatico-musical work" (as hereinafter defined) accompanied by dialogue, pantomime, dance, stage action, or visual representation of the work from which the music is taken;

(iii) performance of one or more musical compositions as part of a story or plot, whether accompanied or unaccompanied by dialogue, pantomime, dance, stage action, or visual representation;

(iv) performance of a concert version of a "dramatico-musical work" (as hereinafter defined).

The term "dramatico-musical work" as used in this Agreement shall include, but not be limited to, a musical comedy, opera, play with music, revue, or ballet.

## 3. License Fees and Payments

(a) In consideration of the license granted herein, LICENSEE agrees to pay SOCIETY the applicable license fee set forth in the Rate Schedule annexed hereto and made a part hereof, based on "LICENSEE's Operating Policy." The term "LICENSEE's Operating Policy" shall mean all of the factors which determine the license fee applicable to the premises under the Rate Schedule.

(b) LICENSEE warrants that the Statement of LICENSEE's Operating Policy attached to and made a part of this Agreement is true and correct as of the date hereof.

(c) The current applicable license fee for the premises is *529.00* annually, based on the factors set forth in the Statement of LICENSEE's Operating Policy.

(d) LICENSEE agrees to pay SOCIETY the license fee due hereunder in installments of one-third the applicable annual fee in advance on or before January 1, May 1 and September 1 of each year provided, however, that if LICENSEE does not otherwise owe SOCIETY any fees under this or any prior license agreement, and if LICENSEE pays the full annual fee on or before January 31st of any year, the applicable license fee for that year shall be reduced by 20%.

(e) LICENSEE agrees to pay SOCIETY a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ check, draft or other form of monetary instrument submitted by LICENSEE ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ under by 30 days or more,

(f) In the event LICENSEE shall be delinq▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the maximum rate permitted LICENSEE agrees to pay a finance charge on the ▮▮▮▮▮▮▮▮▮▮▮▮ is less, from the date such by the law of the state in which the premises li▮▮▮▮▮▮▮▮
license fees became due.

(g) In the event that LICENSEE's payment of fees under this Agreement causes SOCIETY to incur a liability to pay a gross receipts, sales, use, business use, or other tax which is based on the amount of SOCIETY's receipts from LICENSEE, the number of licensees of SOCIETY, or any similar measure of SOCIETY's activities, and (i) SOCIETY has taken reasonable steps to be exempted or excused from paying such tax; and (ii) SOCIETY is permitted by law to pass through such tax to its licensees, LICENSEE agrees to pay to SOCIETY the full amount of such tax.

### 4. Changes in LICENSEE's Operating Policy

(a) LICENSEE agrees to give SOCIETY thirty days prior written notice of any change in LICENSEE's Operating Policy. For purposes of this Agreement, a change in LICENSEE's Operating Policy shall be one in effect for at least thirty days.

(b) Upon any change in LICENSEE's Operating Policy resulting in an increase in the license fee, based on the annexed Rate Schedule, LICENSEE agrees to pay SOCIETY the increased license fee, effective as of the initial date of such change, whether or not written notice of such change has been given pursuant to subparagraph "4(a)" hereof.

(c) Upon any change in LICENSEE's Operating Policy resulting in a reduction in the license fee, based on the annexed Rate Schedule, LICENSEE shall be entitled to the reduction, effective as of the initial date of such change, and to a *pro rata* credit for any unearned license fees paid in advance, provided LICENSEE has given SOCIETY thirty days prior written notice of such change. If LICENSEE fails to give SOCIETY thirty days prior written notice, any reduction and credit shall be effective thirty days after LICENSEE gives SOCIETY written notice of the change.

(d) Within thirty days of any change in LICENSEE's Operating Policy, LICENSEE shall furnish to SOCIETY a current Statement of LICENSEE's Operating Policy and shall certify that it is true and correct.

(e) If LICENSEE discontinues the performance of music at the premises, LICENSEE or SOCIETY may terminate this Agreement upon thirty days notice, the termination to be effective at the end of the thirty day period. In the event of such termination, SOCIETY shall refund to LICENSEE a *pro rata* share of any unearned license fees paid in advance. For purposes of this Agreement, a discontinuance of music shall be one in effect for no less than thirty days.

### 5. Breach or Default

Upon any breach or default by LICENSEE of any term or condition herein contained, SOCIETY may terminate this license by giving LICENSEE thirty days notice to cure the breach or default, and in the event that it has not been cured within the thirty day period, this license shall terminate on the expiration of that period without further notice from SOCIETY to LICENSEE.

### 6. Interference in SOCIETY's Operations

In the event of:

(a) any major interference with the operations of SOCIETY in the state, territory, dependency, possession or political subdivision in which LICENSEE is located, by reason of any law of such state, territory, dependency, possession or political subdivision; or

(b) any substantial increase in the cost to SOCIETY of operating in such state, territory, dependency, possession or political subdivision, by reason of any law of such state, territory, dependency, possession or political subdivision, which is applicable to the licensing of performing rights,

SOCIETY shall have the right to terminate this Agreement forthwith by written notice and shall refund to LICENSEE any unearned license fees paid in advance.

### 7. Notices

All notices required or permitted to be given by either party to the other hereunder shall be duly and properly given if:

(a) mailed to the other party by registered or certified United States Mail; or

(b) sent by electronic transmission (i.e., Mailgram, facsimile or similar transmission); or

(c) sent by generally recognized same-day or overnight delivery service,

addressed to the party at the address stated above. Each party agrees to inform the other of any change of address.

IN WITNESS WHEREOF, this Agreement has been duly executed by SOCIETY and LICENSEE

this 30th day of *Oct* , 1992.

AMERICAN SOCIETY OF COMPOSERS,
AUTHORS AND PUBLISHERS

By *William Jialder*

*District Manager*
Title

*Jay Kay Jay, Inc.*

By x *Kathleen A Smith*

*Pres.*
Title

(Fill in capacity in which signed:
(a) if corporation, state corporate office held;
(b) if partnership, write word "partner" under signature of signing partner;
(c) if individual owner, write "individual owner" under signature.)



## COMMERCIAL MUSIC SERVICE AGREEMENT



Sales Rep. _T.R._

Sales # _50333_

| BUSINESS NAME (SUBSCRIBER) | ATTN: | | INSTALL DATE |
|---|---|---|---|
| Pumps Plus / Jay Kay Jay Inc. | Kathy Tartivita | | 7/13/94 |

| ADDRESS | SUITE # | SEATING | TOTAL OCCUPANCY | SQ. FT. |
|---|---|---|---|---|
| 77 Rt2. 36 POBOX 13 | | | | |

| ZIP | BUSINESS PHONE | OTHER PHONE | ACCT # |
|---|---|---|---|
| Keansburg | 787-7500 | | 0190057646 |

| BILLING ADDRESS (IF DIFFERENT) | TYPE | OWNER/MANAGER |
|---|---|---|
| Jay Kay Jay Inc   t/a Pumps Plus | | |
| 77 Hwy 36, Keansburg, N.J. 07734 | PHASE | ADDRESS |
| | MAP | CITY, STATE, ZIP | PHONE |

The parties agree as follows:

1. **MUSIC SERVICE.** During the term of this Agreement, the Supplier shall provide subscription music programming (the "Digital Music Service") to Subscribe at the Premises, at the recurring monthly charge set forth in Section 3(b) below.
2. **EQUIPMENT.** Supplier shall provide the equipment listed in Exhibit A ("Provided Equipment") to the Premises, in accordance with the selected fee option fc equipment set forth in Section 3(a) and/or 3(b) below.
3. **FEES.** In consideration of the equipment and services provided to the Subscriber and as described above, Subscriber shall pay the following fees and charge to Supplier in the manner set forth herein:

(a) One-time charges:                                                                                    START BILLING SEPT $1,1994

| | |
|---|---|
| Purchased Tuner | $ |
| Purchased Other Equipment (Described on Exhibit A) | $ |
| Equipment Installation | $ 30.00 |
| Taxes | $ 1.80 |
| TOTAL | $ NO CHARGE |

(b) Recurring monthly charges payable in advance of each month's service during the term hereof:

| | |
|---|---|
| Digital Music Service | $ 60.00 |
| Other | $ |
| Franchise Fees                       T.R | $ |
| TOTAL  $150 Disconnect Fee,  75 Tag Line Ads (DMX Promo) | $ |

4. **TERM.** This Agreement shall remain in effect for an initial term of ___60___ months from Install Date and shall be automatically renewed for subsequen twelve (12) month terms unless terminated at the end of any term by either party by written notice given to the other party at the address shown herein (c such other address as is subsequently provided by writing to the notifying party by the other party) by certified or registered mail at least ninety (90) days pric to the expiration of the then existing term.
5. **USE OF DIGITAL MUSIC SERVICE.** Subscriber agrees that without the prior written consent of Supplier, the Digital Music Service or signal applicable theretc shall not be (i) copied, recorded or dubbed for additional replay within or outside of the premises, or (ii) interrupted or supplemented by Subscriber for the purpose of inserting therein any commercial announcements for which Subscriber or any other person receives consideration of any kind, or (iii) used to dia place a live orchestra or an accompaniment to dancing, skating, or other similar forms of entertainments for which an entrance fee is charged. Subscriber shal not transmit the Digital Music Service nor use the services contained therein outside the Premises as designated in this Agreement.
6. **ENGINEERING REVIEW.** Activation of Digital Music Service is subject to Supplier's engineering review for distribution availability by existing cable plant, o alternative delivery options, if available, and may require additional fees as indicated in Section 3(a) "Other" above, if any. In the event Supplier determines that Digital Music Service is not available to the Premises of Supplier, this Agreement shall be void ab initio, and Subscriber shall be entitled to a refund c all prepaid charges in accordance with Supplier's refund policies.
7. **ADDITIONAL TERMS AND CONDITIONS.** THIS AGREEMENT IS SUBJECT TO THE ADDITIONAL TERMS AND CONDITIONS SET FORTH ON THE RE VERSE SIDE HEREOF AND ARE MADE A PART OF THIS AGREEMENT. This Agreement shall become binding on the parties hereto when signed by Sub scriber and accepted and approved by Supplier.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year stated above.

Subscriber _Kathleen A Quatel/Fr_ Date _8/1/94_

_Jay Kay Jay Inc t/a Pumps Plus_

_77 Hwy 36, Keansburg NJ_

Supplier _Thomas Roche_    Date _8/1/94_

_TKR Cable Co_

DIVISION AUTHORIZATION _____

TUNER # _BC366GRPK8085CGZ_     PAYMENT REC'D _____  _____ ATE: _____

ADDITIONAL TUNER #'S _____

"B"

8. **INSTALLATION AND MAINTENANCE OF EQUIPMENT.** Subscriber hereby grants Supplier (subject to any necessary governmental or third party approvals) the right to install all necessary equipment for receiving the Digital Music Service, including but not limited to an exterior antenna, a cable television connection or a satellite receiver "dish". Supplier-owned equipment provided to Subscriber hereunder shall be maintained by Supplier (other than microphones) in good operating condition for a period of one (1) year from the date of installation at no additional charge to Subscriber; provided, however, that such maintenance shall be exclusively limited to that resulting form ordinary and proper use of the equipment. Thereafter, or in the event of maintenance during the first year that does not result from ordinary and proper use of the equipment, Subscriber shall pay Supplier's usual and customary repair charges for maintenance of the equipment. SUPPLIER'S OBLIGATIONS UNDER THIS PARAGRAPH ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, RELATING TO THE EQUIPMENT, INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. In the event Subscriber purchases the Digital Music Service Tuner, said Tuner shall be covered by a two (2) year Unconditional Warranty provided by Supplier for repairs and/or replacement, that arise from manufacturer's defects and/or normal wear and tear. Except for Supplier's maintenance obligations as set forth herein, Subscriber shall indemnify Supplier and hold it harmless from and against any and all losses, claims and expenses relating to the equipment provided hereunder to Subscriber, including, without limitation losses caused by accident, fire, theft or misuse of the equipment. Subscriber shall provide Supplier with reasonable access to the Premises during normal hours for purposes of performing required maintenance. Supplier shall retain ownership of all equipment provided hereunder that has not been purchased by Subscriber. Subscriber shall not, directly or indirectly, sell, mortgage, pledge, or otherwise dispose or encumber any Supplier-owned equipment provided to Subscriber, nor shall it change the location of, tamper with, or alter in any manner such equipment. Subscriber shall execute such further documents as are necessary or desirable to protect Supplier's interests in such equipment, shall adequately insure such equipment against damage or loss and present evidence of such insurance to Supplier upon request and shall, under the expiration or earlier termination of this Agreement, promptly return to Supplier all of such equipment in good condition (or pay the full replacement value thereof). If the Digital Music Service is no longer provided to the Subscriber's premises, Subscriber shall provide Supplier with reasonable access to such premises for purposes of removing any Supplier-owned equipment. Upon the removal of any Supplier-owned equipment. Supplier shall not be required to repair, replace or other wise reestablish the premises to their original condition.

9. **ADDITIONAL CHARGES.** Subject to Subscriber comply with Section 5 of this Agreement, Subscriber shall not be responsible for any copyright fees or royalties associated with Supplier's provision of the Digital Music Service to Subscriber. All one-time charges shall be due an payable upon the following terms: Fifty percent (50%) upon the signing of this Agreement and the remaining fifty percent (50%) upon the completion by Supplier of installation of equipment and commencement of service. Recurring charges shall be payable monthly in advance shall be due on the first day of the calendar month to which the charges relate. In addition to the fees specified on the reverse side of this Agreement, Subscriber shall pay to Supplier any sales, use, excise or other taxes or governmental charges (except income taxes) arising under this Agreement. Late payments shall be subject to an interest charge at the maximum rate permitted by law. Annually during the term of this Agreement, Supplier may increase the recurring charges on thirty (30) days prior written notice to Subscriber by a percentage, increase not to exceed ten percent (10%).

10. **ASSIGNMENT.** Subscriber shall not assign its rights or delegate its duties under this Agreement without the prior written consent of Supplier, which consent shall not be unreasonably withheld. Any assignment of this Agreement by Subscriber without Supplier's written consent shall be void and shall, at Supplier's option, constitute a breach hereof by Subscriber. In the event Subscriber ceases to do business at the Premises, Subscriber shall return to Supplier, in the manner designed by Supplier, all Supplier-owned equipment installed at the Premises; such cessation shall not; however, reduce Subscriber's payment obligations hereunder unless Supplier otherwise agrees in writing. This Agreement shall be fully assignable by Supplier. Subject to the foregoing, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors, representatives and assigns.

11. **FAILURE OR INTERRUPTION OF SERVICE.** In the event Supplier fails to provide the Digital Music Service for twenty-four (24) consecutive hours and Subscriber provides Supplier with written notice thereof within forty-eight (48) hours of such failure, Supplier shall credit Subscriber's account with an amount equal to one-thirtieth (1/30) of the recurring monthly charge then payable by Subscriber; provided, however, that such credit shall not be given and Supplier shall not otherwise be liable) for any such failure (or any other failure of Subscriber to perform its obligations hereunder) due to acts of God, strikes, emergencies, mechanical failures, regulatory or any governmental action, action or inaction by Subscriber, its licensees, contractors employees, agents or invitees, a breach of this Agreement by Subscriber, and any other cause beyond Supplier's reasonable control. In no event shall Supplier be liable for incidental, consequential or special damages arising out of or relating to this Agreement. Said credit shall be the sole and exclusive remedy of Subscriber with respect to any interruption or failure of the Digital Music Service.

12. **TERMINATION BY SUPPLIER.** If Subscriber fails to perform any of its obligations hereunder, does not cure such breach within thirty (30) days after written notice thereof from Supplier, or if Subscriber becomes insolvent or bankrupt, Supplier, in addition to all other rights it may have under law or this Agreement, shall have the right (i) to declare all amounts to be paid by Subscriber during the remaining term hereof immediately due and payable, (ii) to cease providing services to Subscriber, and (iii) immediately to enter the Premises and take possession of all Supplier-owned equipment without liability to Subscriber therefor and without relieving Subscriber of its obligations under this Agreement. Subscriber shall reimburse Supplier for all costs and expenses, including, reasonable attorney's fees and court costs, incurred in connection with Supplier's exercise of its rights under this Agreement.

13. **MISCELLANEOUS.**
   (a) This Agreement constitutes the entire Agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements, conversations, representations, promises of warranties (express or implied) whether verbal or written. No modifications of this Agreement shall be valid unless made in writing and signed by both parties; provided, however, the Supplier shall have the right to modify or terminate this Agreement in the event that any license agreement applicable to Supplier's provisions of the Digital Music Service (including without limitation, its license agreements with ASCAP and BMI) is modified or terminated.
   (b) The rights of the parties under any provision of this Agreement shall be governed by the laws of that state under which the contract was signed. Subscriber consents to the personal jurisdiction of the state and federal courts in that state for purposes of litigation involving this Agreement.
   (c) The waiver of a breach of any provision of this Agreement shall not be construed as a waiver of any subsequent breach of the same or a different provision of this Agreement.
   (d) All notices to be sent by either party shall be in writing and shall be sent certified mail, postage prepaid, to the respective addresses set forth below their signatures on the reverse side.
   (e) Each party represents and warrants that it has the power and authority to enter into this Agreement and discharge its obligations hereunder, and each person executing this Agreement on behalf of a party represents that he or she has the power and authority to sign this Agreement on behalf of such party.
   (f) If any clause or provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, then, and in that event, it is the intention of the parties hereto that the remainder of this Agreement shall not be affected thereby.

# DMX. for Business

A Revolutionary Music Service That Deliver
More Pure Digital Music To Your Business
Than Anyone In The World.



- Unlimited selection to fit your business exactly.
- Over 500,000 original artists' songs.
- Uninterrupted delivery, 100% fresh, 24-hours a day.
- All controlled by a touch of a button.

**MUSIC EXPRESSLY PROGRAMMED FOR THIS ESTABLISHMENT BY:**



**DIGITAL MUSIC EXPRESS**

**B U S I N E S S**

**LICENSED BY:**



# BMI



**ALL CLEARANCES AND RIGHTS FEES PAID BY DIGITAL MUSIC EXPRESS**
**1-800-745-8863**



## LOCALLY ORIGINATED CABLE PROGRAMMING
## BLANKET LICENSE AGREEMENT

AGREEMENT dated as of March 1, 2002, between the AMERICAN

SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS ("ASCAP") and CSC

HOLDINGS, INC., FOR ITSELF AND THOSE ENTITIES LISTED ON SCHEDULE 1

ATTACHED HERETO, ("Licensee"), as follows:

**I.    DEFINITIONS**

    **A.    "Locally Originated Programming"**

        "Locally Originated Programming" as used in this Agreement shall mean

programming locally produced, inserted locally or through an interconnect (an

association of two or more cable systems for the purpose of distributing advertising or

programming simultaneously) or otherwise originated by, for, or on any of Licensee's

Distribution Systems, as defined in section I(B), including, without limitation,

(i) programming on locally-originated channels, including advertising and promotional

materials thereon; (ii) programming on public, educational and governmental ("PEG")

access channels; (iii) public service announcements; (iv) programming on leased access

channels; and (v) advertising and promotional materials inserted locally or through an

interconnect by or on behalf of Licensee into national, regional or local cable

programming services. "Locally Originated Programming" shall also include statewide,

regional and local news and/or sports programming predominantly created by the cable

operator and predominantly distributed to its own subscribers within the ADI or DMA in

which the Distribution System is located or an extension thereof where such extension is



fiber or through an interconnection. For the avoidance of doubt, such programming shall not include regional sports networks such as MSG or Fox Sports.

**B.**   **"Licensee's Distribution Systems"**

As used in this Agreement, "Licensee's Distribution Systems" shall mean each and every Distribution System which is authorized to transmit any Locally Originated Programming supplied by Licensee as set forth in Exhibit A.

**C.**   **"Subscriber"**

"Subscriber" as used in this Agreement shall mean each location to which Licensee provides Locally Originated Programming.  Subscribers shall include each occupied dwelling (whether in a single family dwelling or a multi-unit building), bar, restaurant, hotel or motel room, and other residential or commercial location at which Locally Originated Programming is received through a Distribution System.  For purposes of calculating the license fees owed under this Agreement in the year 2000 and following, as provided in Section V herein, the number of Subscribers for each year shall be the average of the number of subscribers as of December 31 of the prior year and December 31 of the year for which the interim fee is being calculated.  If a Distribution System was acquired or transferred within a calendar year, the number of Subscribers shall mean the average of the number of Subscribers as of the date of acquisition/transfer and the number of subscribers as of (1) December 31 of the current year for an acquisition or (2) December 31 of the prior year for a transfer.

**D.**   **"Dramatic Performance"/"Non-Dramatic Performance"**

(1)   "Dramatic Performance" as used in this Agreement shall mean a performance of a musical composition in Locally Originated Programming in which there

is a definite plot depicted by action and where the performance of the musical composition is woven into and carries forward the plot and its accompanying action, including, but not limited to, any opera, operetta, musical comedy, play or like production, as such, in whole or in part, or the performance of any composition from any opera, operetta, musical comedy, play or like production in a manner which recreates the performance of such composition with substantially such distinctive scenery or costume as was used in the presentation of such opera, operetta, musical comedy, play or like production (whether or not such opera, operetta, musical comedy, play or like production was presented on the stage or in motion picture form). The use of dialogue to establish a mere program format or the use of any non-dramatic device merely to introduce a performance of a composition shall not be deemed to make such performance dramatic.

(2)     "Non-Dramatic Performance" as used in this Agreement shall mean any performance of a separate musical composition which is not a dramatic performance as defined herein.

(3)     The definitions of the terms "Dramatic Performance" and "Non-Dramatic Performance" contained in this paragraph are for purposes of this Agreement only and for the term hereof, and shall not be binding upon or prejudicial to any position taken by either of the parties subsequent to the expiration of this Agreement, or used or cited for any purpose other than as contained herein.

E.     "License Period"

As used in this Agreement, "License Period" means the period July 18, 1989 through December 31, 2006.

F.    "United States"

As used in this Agreement, the "United States" shall be deemed to include the United States of America — its commonwealths, territories, trust territories, dependencies, and possessions during the term hereof, including but not limited to Guam, Puerto Rico, and the United States Virgin Islands.

G.    "Year"

As used in this Agreement, "Year" shall mean a calendar year.

## II.    LICENSE

ASCAP grants to Licensee and Licensee accepts, for the License Period, a non-exclusive license to perform in and as part of Locally Originated Programming over each of Licensee's Distribution Systems within the United States, nondramatic public performances of musical compositions now or hereafter during the term hereof in the ASCAP repertory, or as to which ASCAP has or shall have the right to grant such license during the term hereof.

## III.    LIMITATIONS

A.    "Foreign Distribution"

Nothing herein contained shall be deemed to grant to Licensee the right to perform publicly the compositions licensed hereunder outside of the United States, it being understood that with respect to such foreign performances, such Licensee must obtain licenses from the owners of the performing rights in the compositions or the relevant performing rights society in the country in which such foreign performances are transmitted or received.

**B.**     **"Dramatic Performances"**

This license does not extend to or include dramatic performances of compositions in the ASCAP repertory; provided, however, that the rights granted to Licensee under this license shall be deemed to include a grant of the right to make non-dramatic public performances of compositions licensed hereunder by the transmission of a motion picture containing such compositions if the rights in such motion picture other than those licensed under this license have been obtained from the parties in interest. Nothing herein contained shall be deemed to license the public performance by television broadcasting or otherwise of dramatic performances.

**C.**     **"Scope"**

Except as herein expressly provided, nothing herein contained shall be construed as authorizing Licensee to grant to others any right to reproduce or perform publicly, by any means, method or process whatsoever, any of the musical compositions licensed hereunder or as authorizing any Subscriber of any Licensee, including bars, restaurants and other commercial establishments that may be Subscribers, to further transmit or reproduce the same, by any means, method or process whatsoever, provided, however, that Licensee shall  not be responsible for the monitoring, reporting, or preventing of unauthorized public performances of ASCAP music by any unrelated third party.

**D.**     **"Right to Restrict"**

ASCAP members shall have the right, at any time and from time to time, in good faith, to restrict the transmission of compositions from musical comedies, operas, operettas and motion pictures, or any other composition being excessively broadcast,

only for the purpose of preventing harmful effect upon such musical comedies, operas, operettas, motion pictures or compositions, in respect of other interests under the copyrights thereof; provided, however, that the maximum number of compositions which may be at any time thus restricted shall not exceed 750 and that limited licenses will be granted upon application to ASCAP entirely free of additional charge as to restricted compositions, if and when the copyright owners thereof are unable to show reasonable hazards to their major interests likely to result from such transmission; and provided further that such right to restrict any such composition shall not be exercised for the purpose of permitting the fixing or regulating of fees for the recording or transcribing of such composition; and provided further that in no case shall any charges, "free plugs," or other consideration be required in respect of any permission granted to perform a restricted composition; and provided further that in no event shall any composition, after the initial transmission thereof, be restricted for the purpose of confining further television broadcasts thereof to a particular artist, station, network or program.

ASCAP reserves the further right, at any time and from time to time, in good faith, to restrict the transmission of any compositions, over and above the number specified in this paragraph, as to which any suit has been brought or threatened on a claim that such composition infringes a composition not contained in the ASCAP repertory or on a claim that ASCAP does not have the right to license the public performance of such composition by television broadcasting.

IV.   FEES

In consideration for the license granted herein, Licensee agrees to pay to ASCAP for each year of the License Period hereof a license fee as follows:

1989 - $0.0114 per subscriber (partial year)

1990 - $0.025 per subscriber

1991 - $0.040 per subscriber

1992 - $0.045 per subscriber

1993 - $0.055 per subscriber

1994 - $0.060 per subscriber

1995 - $0.070 per subscriber

1996 - $0.075 per subscriber

1997 - $0.083 per subscriber

1998 - $0.083 per subscriber

1999 - $0.083 per subscriber

2000 - $0.083 per subscriber

2001 - $0.083 per subscriber

2002 - $0.083 per subscriber

2003 - $0.083 per subscriber

2004 - $0.083 per subscriber

2005 - $0.083 per subscriber

2006 - $0.083 per subscriber

Licensee will use good faith efforts to perform its reporting and payment obligations on a consolidated corporate entity basis to facilitate, where reasonably practicable, a single fee report (in the form appended as Exhibit B hereto), and payment for all Distribution Systems as listed on Exhibit A (the Licensee's Distribution Systems), setting forth on such consolidated report the Subscribers and fees for each individual Distribution System. Licensee represents that all its Distribution Systems transmitting

8

Locally Originated Programming containing ASCAP Music for any part of the License Period are listed on Exhibit A to this Agreement, and acknowledge than any Distribution System not listed hereunder is not licensed hereby, provided, however, that no Licensee need submit reports or payments for years for which fees have already been paid to ASCAP.  Licensee may add to Exhibit A any other Distribution System it wishes to be licensed under this Agreement, at any time during the term of the Agreement.

V.     **LICENSE FEE PAYMENTS**

ASCAP acknowledges that, in light of the interim fee payments ASCAP has received, Licensee owes no additional fee payments for the period July 18, 1989 through December 31, 1999.

For the period January 1, 2000 through December 31, 2001, license fee payments shall be due on May 15, 2002.  In connection with such payment, ASCAP shall, in accordance with the schedule attached as Exhibit A hereto, credit Licensee with the amount, if any, by which Licensee has paid fees to ASCAP in excess of amounts due for the period January 1, 1998 through December 31, 1999.

For the period January 1, 2002 through December 31, 2006, license fee payments shall be due annually on March 15, each payment encompassing the previous calendar year.  License fees shall be calculated with reference to the number of Subscribers as provided in Section I(C) herein.

VI.    **AUDIT**

ASCAP shall have the right, during customary business hours and not more than once each year of the License Period, on notice in writing of not less than twenty business days, to conduct an audit to verify Licensee's Subscriber counts as listed on its fee reports, whether there is use of ASCAP music, and the identity of Licensee's

Distribution Systems. The final audit under this provision shall occur within two years after the end of the License Period. In any given year, audits of multiple systems of Licensee shall be limited to no more than 20% or 1 system, whichever is the greater, of the total number of Distribution Systems other than any listed on Exhibit A. ASCAP may audit such systems for every year of the License Period. In the event such audits reveal in a given year a net under-reporting of Subscribers of greater than 2% of the total number of Subscribers covered by such audits or inaccuracy as to whether a Distribution Systems distributed Locally Originated Programming containing ASCAP Music during any part of the License Period, ASCAP shall have the right to audit the Subscriber count of additional systems for any 3 years of the License Period. If any audit reveals an underpayment by Licensee, ASCAP shall notify Licensee in writing within 120 days of the audit, and ASCAP's failure to so notify Licensee shall constitute a waiver of any claim based on such audit. All information coming to ASCAP's attention as a result of any such examination shall be held completely and entirely confidential and shall not be used by ASCAP other than in connection with the administration and enforcement of this Agreement. Notwithstanding the foregoing, if Licensee provides to ASCAP copies of the appropriate sections of its Statements of Account for any Distribution System as filed with the United States Copyright Office pursuant to 37 CFR § 201.17 (1999 ed.) demonstrating that the number of subscribers used for the calculation of the license fees provided hereunder with respect to any year is not less than the average of subscribers reported on the Statements of Account filed in the United States Copyright Office for such year including the most recent Statement of Account of the previous year and calculated in accordance with Section 1(c) of this Agreement, then ASCAP shall not

audit such subscriber counts; provided, however, that Licensee shall notify ASCAP in writing of any amended or corrected Statements of Account filed by Licensee for such Distribution System for such year. Nothing in this Section shall be deemed to limit Licensee's obligation to make true, accurate and complete fee reports as provided in this Agreement or ASCAP's right to payment of the license fees otherwise due under this Agreement.

## VII.   LATE PAYMENT CHARGE

ASCAP may impose a late payment charge of 1.5% per month from the date payment was due on any undisputed amount that is received by ASCAP more than 15 days after the due date, provided that such due date occurs on or after March 15, 2003.

## VIII.   DELIVERY OF MATERIALS

### "Cue Sheets"

Licensee, as a matter of course, shall cause cue sheets to be created with respect to all Locally Originated Programming during the term of this Agreement for distribution on the Licensee's Distribution Systems. Such cue sheets shall contain, where reasonably available, information identifying the title, writer, composer, publisher, nature and type of use, manner of performance, duration of performance and performing rights society affiliation of all entitled parties of all music compositions in the Locally Originated Programming during the term of this Agreement. Such cue sheets shall be delivered to ASCAP electronically using software provided at no charge or approved by ASCAP. Licensee shall also request cue sheets from licensors and outside producers with respect to all programming produced by others and distributed as Locally Originated Programming on the Licensee's Distribution System and shall furnish those cue sheets to ASCAP.

IX.   INDEMNIFICATION, REPRESENTATIONS AND WARRANTIES

A.   "Indemnification"

ASCAP agrees to indemnify, save and hold harmless and defend Licensee, its parents, subsidiaries, successors, assigns, and agents, sponsors, advertising agencies, and its and their officers, employees, and artists, from and against any claims, demands or suits that may be made or brought against them or any of them with respect to the nondramatic public performances licensed under this Agreement of any compositions in ASCAP's repertory which are written or copyrighted by members of ASCAP or as to which ASCAP has or shall have rights to grant performance licenses during the term hereof.

B.   "Notice and Cooperative Defense of Claims"

Licensee agrees to give ASCAP prompt notice of any claim, demand or suit of the type specified in subparagraph A above, and agrees promptly to deliver to ASCAP all papers pertaining thereto. ASCAP at its own expense shall have full charge of the defense of any such claim, demand or suit, and Licensee shall cooperate fully with ASCAP in such defense. Licensee, however, shall have the right to engage counsel of its own, at its own expense, who may participate in the defense of any such action and with whom counsel for ASCAP shall cooperate.

C.   "Representations"

Each of the parties represents and warrants that it has taken all necessary action and has secured the consents of all persons necessary to authorize the execution of this Agreement and performance of all its obligations hereunder. Each party represents that the person executing this Agreement on its behalf is duly authorized to do so, and

that this Agreement is and shall be during its term a binding obligation of the party on whose behalf it is executed. Each party represents to the other that the execution and performance of this Agreement is not barred, prohibited or impaired by any existing law, rule, regulation, court or administrative order or decree, contract or agreement to which it is now a party, or by which it is bound.

## X.   BREACH AND DEFAULT

Upon any breach or default by Licensee of the terms herein contained, including without limitation, failure to make timely payments under Section V hereof, ASCAP shall give Licensee thirty (30) days' notice in writing to cure such breach or default. In the event that any such breach or default has not been cured within said thirty (30) days, ASCAP may then promptly terminate this Agreement by giving notice of such termination to Licensee, in writing.

## XI.   NOTICES

All notices, statements and other documents required to be given hereunder shall be mailed or delivered to the parties at the following addresses, or such other individuals or addresses as the parties may by written notice designate:

If to ASCAP:

ASCAP
One Lincoln Plaza
New York, N.Y. 10023

Attention:   Director of Licensing

Copy to:

Martin Flumenbaum, Esq.
Jay Cohen, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison
1285 Avenue of the Americas
New York, N.Y. 10019-6064

If to Licensee:

> [Address] CSC Holdings, Inc., 1111 Stewart Avenue,
> Bethpage, NY 11714
> Attention: Programming Department
>
> Copy to: Legal Department
>
> National Cable Television Association
> 1724 Massachusetts Avenue, N.W.
> Washington, D.C. 20036
>
> Attention: Daniel L. Brenner, Esq.

## XII.   MOST FAVORED NATIONS

In the event Licensee, at any time during the term hereof, shall, for the licensing of nondramatic public performances of musical compositions as part of Locally Originated Programming over Licensee's Distribution Systems within the United States, pay fees to BMI or any performing rights society in excess of fees set forth in Section IV hereof, Licensee agrees to pay fees at such rates to ASCAP for the balance of the term hereof.

## XIII.   SUCCESSORS AND ASSIGNS

This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns, but no assignment shall relieve the parties hereto of their respective obligations hereunder provided that Licensee will only be responsible for payment obligations accrued as of and through the effective date of any such assignment. If a Distribution System listed on Exhibit A was purchased by Licensee during the Term, Licensee shall only be responsible for license fees accruing after the effective date of such purchase if such Distribution System was licensed by ASCAP for prior periods during the License Period. Otherwise, Licensee shall be responsible for license fees for such Distribution System throughout the License Period.

If Licensee sells or otherwise transfers a controlling share of its stock or other ownership interest in one or more Distribution Systems, Licensee will delete such Distribution System(s) from Exhibit A and will be relieved of all liability hereunder with respect to such Distribution System(s) from the date of closing going forward. Licensee shall provide ASCAP with the name and address of the acquiring party within thirty (30) days of the effective date of such transfer. Licensee agrees to provide ASCAP with a final payment concerning such Distribution System(s) of any fees accrued as of the days of such sale or transfer, payable at the next scheduled fee payment date in accordance with Section IV of this Agreement. Computation of Licensee's fee payment obligation with respect to Subscribers will be prorated and based on the number of Subscribers of such Distribution System(s) as of the date of such sale or transfer.

## XIV.   WITHOUT PREJUDICE TO SUBSEQUENT PERIODS

ASCAP and Licensee agree that the terms of this Agreement shall be without prejudice to any position either party may take in any negotiation or proceeding for determination of reasonable fees for blanket or per program licenses for Locally Originated Programming distributed by Licensee for any period subsequent to the License Period.

## XV.   EXECUTION

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

## XVI.   ENTIRE AGREEMENT

This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof.  It may not be amended, modified, or terminated except by a written instrument signed by both of the parties.

## XVII.  APPLICABLE LAW

Licensee and ASCAP agree that this Agreement shall be governed by and construed in accordance with the laws of the State of New York pertaining to contracts made and fully prepared therein.

AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS

_____2/4/03_____     By: _____
Date

CSC HOLDINGS, INC., FOR ITSELF AND THOSE ENTITIES LISTED ON SCHEDULE 1 ATTACHED HERETO

_____
Date

By: _____

## SCHEDULE I

Subsidiaries and affiliates of CSC Holdings, Inc., which are severally liable parties to the Agreement, are as follows:

Cablevision of Litchfield, Inc.
Cablevision of Connecticut, Limited Partnership
Cablevision of Newark
Cablevision of New Jersey, Inc.
Cablevision of Monmouth Inc.
Cablevision of Hudson County, Inc.
Cablevision of Oakland, LLC
Cablevision of Paterson, LLC
Cablevision of Southern Westchester, Inc.
Cablevision of Rockland/Ramapo, LLC
Cablevision of Warwick, LLC
Cablevision Systems of Southern Connecticut Limited Partnership
Cablevision Systems New York City Corporation
CSC TKR, Inc.
Cablevision Systems East Hampton Corporation
Cablevision Systems Great Neck Corporation
Cablevision Systems Huntington Corporation
Cablevision Systems Islip Corporation
Cablevision Systems Long Island Corporation
Cablevision Systems Suffolk Corporation
Cablevision of Brookhaven, Inc.
CSC Acquisition-NY, Inc.
CSC Acquisition-MA, Inc.
Cablevision Systems Dutchess Corporation
Cablevision of Ossining, L.P.
Cablevision of Wappingers Falls, Inc.
Cablevision Systems Westchester Corporation
Cablevision of the Midwest, Inc. (Ohio – Sold 11/1/00)
Telerama, Inc. (Sold 11/1/00)
Cablevision of Cleveland, L.P. (Sold 11/1/00)
Northern Ohio Interconnect (Sold 11/1/00)
Cablevision of Michigan, Inc. (Sold 9/7/00)
Cablevision of Massachusetts, Inc. (Sold 1/5/01)
Cablevision of Boston, Inc. (Sold 1/5/01)
Cablevision of Brookline, L.P. (Sold 1/5/01)

# Is authorization required when only TV or radios are used?

Section 110(5) of the Copyright Act contains a limited exemption for performances by means of radio-over-speakers or televisions in certain establishments only if (1) no direct charge is made to see or hear the performances; (2) the performances are not further transmitted beyond the establishment where they are received; and (3) the original transmission is licensed by the copyright owners — that is, the radio or television station, cable system or satellite carrier is licensed by the copyright owners or their performing rights organizations.

Two types of music users can be exempt if they only use radio-over-speakers or televisions, under different standards: *a food service or drinking establishment* (defined as "a restaurant, inn, bar, tavern, or any other similar place of business in which the public or patrons assemble for the primary purpose of being served food or drink, in which the majority of the gross square feet of space that is non-residential is used for that purpose"), and an *other establishment* (defined as "a store, shop, or any similar place of business open to the general public for the primary purpose of selling goods or services in which the majority of the gross square feet of space that is non-residential is used for that purpose").

A *food service or drinking establishment* is eligible for the exemption if it (1) has less than 3750 gross square feet of space (in measuring the space, the amount of space used for customer parking only is always excludable); or (2) has 3750 gross square feet of space or more *and* (a) uses no more than 6 loudspeakers of which not more than 4 loudspeakers are located in any 1 room or adjoining outdoor space; and (b) if television sets are used, there are no more than 4 televisions, of which not more than 1 is located in any 1 room and none has a diagonal screen size greater than 55 inches.

An *other establishment* is eligible for the exemption if it (1) has less than 2000 gross square feet of space; or (2) has 2000 or more gross square feet of space *and* satisfies the same loudspeaker and television set requirements as for food service or drinking establishments.

(6)

"D"

Jay Kay Jay, Inc.
PO Box 171
Navesink, NJ   07752

Tim Galligar
% ASCAP
2690 Cumberland Parkway SE
Suite 490
Atlanta, Georgia   30339

Re: Your letter dated April 27, 2004: **Postmarked May 8, 2004**
      Alleged account # 16-31-005824-9

May 16, 2004

Dear Mr. Galligar,

      In regard to the above captioned letter, the documentation that you submitted to me
does not support your claim of back fees. As I told you we used a music service which
had already paid the ASCAP and BMI fees. You were informed of this and in fact agreed
that no fees were due. Proof of your agreement is that you did not bill us for 12 years. It
is inconceivable that you now claim we were responsible for ASCAP fees for all of those
years of silence from you.

      I am, however, prepared to offer you a compromise. Even though we continue to use
a music service, we will begin to pay the ASCAP fees, retroactive to January of 2004.
This will avoid protracted litigation on both our parts. The fees should be based upon the
use of background music since we do not employ the services of a DJ.

      If this offer is acceptable to you, kindly send me a current fee schedule and the
necessary paperwork to affirm this agreement.  We will send you the appropriate fee
upon receipt of your correspondence. We await your reply.

Yours truly,

President, Jay Kay Jay, Inc.





**A S C A P**

June 29, 2004

Ms. Kathleen Tartivita
Jay Kay Jay, Inc.
Pumps Plus
P.O. Box 171
Navesink NJ  07752


Dear  Ms. Tartivita:

We understand that there has been a change in the Operating Policy of your establishment.  The present policy and license fee are reflected on the enclosed "Statement of Licensee's Operating Policy."  Please sign and return one copy to this office.

The current status of your account will be reflected on statements sent from our New York Accounting Department.

Sincerely,



Account Sevices



Rate Change
Enclosures:  Statement of Licensee's Operating Policy

CERTIFIED MAIL
7003 1680 0004 6219 1660
SASE
   ACC #:        16-31-005824-9



AMERICAN S                          PUBLISHERS
2690 C                              A 30339

# Statement of Operating Policy
# Pumps Plus
# Jay Kay Jay, Inc.

| | | | |
|---|---|---|---|
| Premise Address: | 77 Highway 36 | Mailing Address: | P.O. Box 171 |
| City, State  Zip: | Keansburg, NJ  07734 | City, State  Zip: | NAVESINK, NJ  07752 |
| Phone: | 732-787-7500 | Fax: | |
| Main Contact: | Ms. Kathleen Tartivita | Account No.: | 16-31-005824-9 |
| Role: | | ALM: | Tim Carter |
| Phone: | 732-787-7500 | TLM: | Amy Ehko |
| | | District: | |

| | | | |
|---|---|---|---|
| Room Number: | 01 | Supplier's Name: | |
| Rate Start Date: | 06/01/2004 | Mechanical Music: | No |
| Rate End Date: | | Jukebox: | No |
| Charge Frequency: | Annual | Licensed by JLO? | |
| Months of Operation: | to | JB Vendor Name: | |
| Seating Capacity: | 160 | Vendor /Owner: | |
| Fire Capacity: | | Music On Hold: | No |
| | | Exception: | |
| | | Total Rate: | $949.00 |

## Policy Chart

| | Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|---|---|---|---|---|---|---|---|
| Live: | | | | | | | |
| Mech : | | Other | Other | Other | Other | Other | Other |
| A/V: | | | | | | | |
| V1: | | Show | Show | Show | Show | Show | Show |
| V2: | | | | | | | |
| V3: | | | | | | | |

**Audio**
- Number of Speakers:
- Type Of Speakers:
- Square Footage:
- Receiver Location:
- Wiring:
- Paging Capability?

**Audio/Video**
- Number of Units:
- Size of each Unit:
- Size Of Screen:
- Projection:
- Self-Contained Speakers?
- Extension Speaker?
- VCR Present?
- Type Of Programming?

*Returned c Check for $949*



SIGN HERE







Kathleen A. Tartivita
156 Bayside Drive
P.O. Box 142
Atlantic Highlands, N.J.  07716 - 0142
Defendant, pro se (732) 872-2145


                              US DISTRICT COURT
                              DISTRICT OF NEW JERSEY

GNAT BOOTY MUSIC et al.

Plaintiffs
vs.                           DOCKET NO. 3:06-ev-0522(GEB)

JAY KAY JAY, INC. and
KATHLEEN A. TARTIVITA

Defendants


                     **CIVIL ACTION**
                         **ORDER**

          **THIS MATTER** having come before the Court by Notice of Motion of
the Defendant, Kathleen A. Tartivita, all parties having been duly served and the Court
having considered arguments for and in opposition of the relief requested and for good
cause shown:

               **IT IS HEREBY ORDERED** that


     1.  Summary  Judgement is granted to the defendants Kathleen A. Tartivita and
         Jay Kay Jay, Inc. and the plaintiffs' complaint against them be and hereby is
         dismissed.

     A copy of this Order shall be served on all parties within seven (7) days.



                              _____
                              John J. Hughes, US Magistrate Judge



                                    1

Kathleen A. Tartivita
156 Bayside Drive
P.O. Box 142
Atlantic Highlands, N.J. 07716 - 0142
Defendant, pro se (732) 872-2145


                              US DISTRICT COURT
                              DISTRICT OF NEW JERSEY

GNAT BOOTY MUSIC et al.

Plaintiffs
vs.                           DOCKET NO. 3:06-cv-0522(GEB)

JAY KAY JAY, INC. and
KATHLEEN A. TARTIVITA

Defendants

                          **CIVIL ACTION**
                   **CERTIFICATION OF SERVICE**


            I, the undersigned hereby certify that I filed a copy of the Notice of Motion
Certification in Support of Motion, Letter Brief, Certification of Service and Proposed form
of Order on

    1. Clerk, US District Court, District of New Jersey, 402 State Street, Room 2020,
       Trenton, NJ 08608 by Overnight Express Mail # EB411415870 US, on October
       111, 2007.

    2. Schumann Hanlon, LLC, 30 Montgomery Street, 15th Floor, Jersey City, NJ
       07302, attorney for the plaintiffs by Certified Mail # 7005 0390 0005 6552 6087
       RRR on October 11, 2007.

    3. Anna C. Little, Esq. attorney for Jay Kay Jay, Inc. 97 Navesink Avenue,
       Highlands, NJ 07732 HAND DELIVERED.


CERTIFICATION: I hereby certify that the foregoing statements made by me are true. I am
aware that if any of the foregoing statements are willfully false, I am subject to punishment.


Dated: October 11, 2007

                                  Kathleen A. Tartivita, pro se

